2-73-0554 James Wischmeyer, plaintiff's appellant, v. Petrochoice, LLC, Defendant, 3rd. Arguing on behalf of the appellant, Mr. Saul Ferris. Arguing on behalf of the appellee, Ms. Stacey K. Schell. Thank you. Mr. Ferris, you may proceed. Thank you, Your Honor. Good morning. Good morning. May it please the Court, my name is Saul Ferris. I represent James Wischmeyer, the appellant. Rule 213 permits litigants to rely on the disclosed opinions of opposing experts and to construct their trial strategy accordingly. I'm quoting from Sullivan v. Edward Hospital, the seminal Supreme Court case which first interpreted Supreme Court Rule 213 when it was passed, replacing 220, 213 requiring much more strict adherence. That's exactly what I did. I constructed my trial strategy according to the disclosures of John Signata, the sole expert witness of the defendant when I cross-examined him. He gave a generic disclosure in his 213 that there were plumbing code violations in my client's basement. And that's what caused the 350 gallons of fuel oil to rise from his basement to the first floor living area, saturate the home, and render it uninhabitable according to the plaintiff. So in a bid of trial advocacy, I was the trial counsel for Mr. Wischmeyer as well as the appellate counsel. I sarcastically said, all right, Mr. Signata, let's start with the first code violation. I had my easel, I had my pen, and I was ready to write down the code violations that he was opining my client violated in his basement, which caused the fuel to migrate. He had nothing. He had no specific code violation. The specific 213 disclosure was... So when you said that, when you're saying that, you're saying that he didn't give you a citation, correct? Correct. Correct. There were disclosures of plumbing code violations, but they were disclosed generically. And what the disclosure says is this violation caused widespread damage to the client's home. So again, on cross-examination, I said, sir, you're saying that this was the lion's share, the cause of the lion's share of damage to my client's home, and yet you didn't bring the code, which my client allegedly violated? It's cross. So on redirect, this is what transpires. Defense counsel hands a code, and it was code 890.1360 of the Illinois Plumbing Code, and presents it to the witness. I object. I said, your honor, 213 was not disclosed. I had no opportunity to consult with an expert, to hire a plumbing expert. The client presented four expert witnesses, an engineer, an environmental engineer, an air quality expert, and a real estate appraiser. We would have gladly hired a plumbing expert if it was in play. The Crow case, which I cited in my brief... What page of your brief is that? Your honor, if I may, Department of Transportation v. Crow, I would need to grab the brief. But it is cited in the Sullivan opinion by stating that you don't have to point out the 213 deficiencies of your opponent. The court said there's no legal, professional, moral obligation to put your opponent on notice of the deficiencies of their 213 disclosures. And so relying on all of this, I didn't hire a plumbing expert. I didn't consult with a plumbing expert. I didn't think the issue was in play. I was going to move to strike. Actually, the issue in Crow was whether counsel was required to move to strike before trial. And that's why the court said, no, there's no obligation, legal, moral, or ethical, to point out the deficiencies before trial. So the plan was taken completely by surprise by the judge allowing counsel to use the specific code violation to rehabilitate John Signata. And under the guise of refreshing recollection. Well, with all due respect to the trial judge, that's just a misapplication of the evidentiary rule of refreshing recollection. There was no recollection to refresh. The witness had never disclosed this specific code. So I believe the trial court abused its discretion by allowing counsel to, and with all candor, that exhibit was not introduced into evidence. But counsel did say, is this the code violation you're referring to? And he argued that. So it was represented to the jury that there was a code violation that was violated. And that's what caused, if I may quote counsel in his closing argument, he exploited the lack of this disclosure by saying 100% of the plaintiff's damage were caused by him. Him, your client? I'm sorry? Him, your client? Yes, caused by the plaintiff. Thank you, your honor. He argued, it's admitted his plumbing was not to quote, was not to code. That's a quote. Supplemental record 22359. Another argument. The damage to the house. I'll go back to your, the trial court's discretion with regard to the 213 issue. Was that issue preserved? Yes, your honor. It was over. Where in the record did you preserve the issue? You raised it in the motion to eliminate it before Sugnata's testimony, but you had to make an objection during trial, did you not? Yes. I'm looking for the exact quote. There is a lengthy objection. The jury was in the room. I asked for a sidebar. It's in the record. I can't give you the exact page right now, but I approached and I said, your honor, this was not disclosed under 213. So, yes, the objection was made and preserved on the record. I will, and it's in the brief, your honor. If you, if you would like me to grab the brief. We have the record. Thank you, your honor. The other 213 area, which the plaintiff alleges violated his right to a fair trial or deprived him of a fair trial, was the undisclosed oil tank replacement deterioration issues, which were attempted to be elicited from Mr. Signata. The trial court sustained the objection to the lack of 213 disclosures of the need to replace a old fuel oil tank. And even though the objection was sustained at supplemental record 1770, the court is going to sustain the objection and the statement deteriorate with time, will be stricken, and you should not consider it jurors. After excluding that evidence, the defendant still argued, and you know, quote, and you know, maybe the new ones don't last as long as the old ones. But unfortunately, the old ones do wear out at some point. You need to keep an eye on the old ones. They're great, but they, when they look like this and they're covered with rust, and that's at supplemental record 2356, volume 2. So not only was it not disclosed in 213s, not only did the court sustain my objection to non-213 disclosures, but moreover, 800 and something pages of the expert's notes and emails were disclosed. There was no report by the expert. There was no deposition of the expert. And in, and I did put this in my brief as well, there was an email to defense counsel that said, I've consulted with the EPA, and there is no Illinois recommendation to replace an old tank. So despite his own expert saying there's no need to replace the tank, counsel still argued it. That was unfair. That caught plaintiff by surprise. It deprived plaintiff of the opportunity to consult his expert on this point. And then the last area is the EPA issue, where counsel repeatedly argued in his closing that the EPA opened the file and closed the file and ordered no remediation of the plaintiff's house. That file was never disclosed to the plaintiff. The plaintiff made this, the centerpiece of his closing argument that you would think that the agency in Illinois that's in charge of environmental issues would do something about this if there was an issue. But, quote, they signed off that nothing further needed to be done. Supplemental Record 2353, Volume 2. The Illinois EPA, I'm quoting from defense counsel during argument, did you hear evidence the Illinois EPA had a file open on this house and closed it? You did hear evidence. There was no evidence whatsoever that anything needed to be done. And those are the people in our state that mandate that process. Well, you would think with all these repeated references to an EPA file that an EPA file would have been disclosed to plaintiff during the discovery process. It was not. There was no file disclosed. Of course it was asked for. There was an omnibus interrogatory request. Well, when Mr. Signata testified and he was asked by, I guess, defense counsel about what did the IEPA, what, if anything, did the IEPA do in this case, and that's when this first came up, they opened a file and they closed a file. Did you object to that particular question or have any sidebar on that particular issue? No, Your Honor. Okay. And did you object to it anyplace else, like in the closing argument when it came up? Yes. Okay. And how did you do that? Was it on sidebar? Yeah, that was on sidebar. And what was it? Yeah, that was on sidebar. And what did Victorias, we'll call it at this point? I'm trying to find my objection. So it is at sub R 2352, volume 2, and how it was laid out was, quote, I'll tell you, this is argument from defense counsel, I'll tell you the Illinois EPA is a tough outfit. If there's anything going on with the spill, they're all over it. Mr. Ferris, objection. That's not a reasonable argument. And then the court admonished the jury, quote, let's be clear, this is just argument. The jury knows what was presented in evidence and will only consider evidence that has been presented. If the attorney says something that you do not recall was in evidence, you will rely on your own recollection of the evidence. So that was my objection. The reason I did not object to Mr. Signata's testimony is it didn't offer an opinion, Your Honor. It offered the basis of an opinion. Mr. Signata said, I spoke with someone at the EPA. They indicated that they opened a file and closed it, ordering no remediation. The 213 basis from Mr. Signata does not say, in my opinion, the plaintiff's house is habitable based in part on the EPA file which was opened, field investigated, and closed when determined no remediation was required. That should have been the basis for which one court case says the bases for the opinions are more important than the opinions themselves. So, by the way, Your Honor, the standard Supreme Court interrogatories also encompasses conversations. The interrogatory which I cite in my brief, it's a standard interrogatory. Any conversations that you or any agent on your behalf has had relating to the claim or damages. So I asked for that testimony would have been encompassed by the discovery request. It was not disclosed. The testimony should have been encompassed? You said would. Isn't your argument should? His testimony should have been encompassed by my discovery request, Your Honor. And it was not disclosed. Can we turn to a couple of the other issues? Sure. Running out of time. Yes. I know you discussed the question. We don't have another case. Well, one glaring prejudicial error that I have to point out, and thank you for the opportunity, let me just jump to the non-IPI jury instruction. So the jury is instructed that you're to calculate the damage to the home by the fair market value minus depreciation. Well, why is damage? I mean, this was a general verdict. So damages was not really an issue, right? I respectfully disagree with Your Honor. Because if the jury was inclined to award damages and they look at an instruction, which is no basis in evidence, they could have thrown up their hands saying, how do we apply this instruction? We heard no evidence on depreciation. And moreover, Your Honor, both parties are entitled to clear, fair instructions based on some evidence. There was no evidence of depreciation. So to me, that is clear. Do you want to address the 12-person jury issue? Just real briefly on that. I am making a hyper-technical argument. Did you waive that issue by agreeing to a replacement of the juror? I did not object to the alternate juror replacing. So in that sense, it would be a waiver. But I cited in my brief the cases that say certain fundamental constitutional rights cannot be waived. And the stating on the record that you have no objection to replacing the juror is clearly a waiver. On its face. You can waive a constitutional right in a trial court. Okay. How about the witness bias issue? Did you want to discuss that at all? Just that the Supreme Court has committees on rules. We adopted the federal. It's a piece of discretion standard. Yes, it is.  And what about the trial transcript accuracy issue? The trial judge just didn't ignore the local rule. There was no review of the transcript. I filed an affidavit that this is not accurate, and the judge is supposed to listen to the transcript, listen to the audio against the transcript, and she didn't do that. And you haven't paid for the transcript yet, right? I have not. And that's what we want. Are you trying to give us an opportunity to make an advisory opinion about the transcript? You can. You're anticipating that you'll probably be sued for the transcript. You can fairly characterize it as an advisory opinion. I would characterize it as a recurring issue or an issue which is likely to arise again, which, again, would justify a ruling on it. But, Your Honor, it's reasonable in this question. Thank you. That's all I have. Do you have any questions? No. Thank you. You have an opportunity to make rebuttal. Thank you, Your Honor. Ms. Shelley? Take your pick, Your Honor. I'm okay with whatever. Good morning, Your Honors. May it please the Court. My name is Stacy Shelley. I'm here on behalf of the defendant in this case, Petrochoice. We ask that you affirm the jury's verdict and the trial court's denial of plaintiff's request for a new trial. I think Justice Burkett hit the nail right on the head, which is there was a general verdict in this case. There were multiple bases upon which the jury could have found in Petrochoice's favor, starting with they just didn't do anything negligent. They didn't believe that Adrienne Avila, on behalf of Petrochoice, failed to exercise ordinary care when filling the tank. They could also have decided that even if there was some negligence, that the contributory negligence of Mr. Wischmeier outweighed that of Petrochoice. And in that situation, Petrochoice wins as well. Because there was no special interrogatory offered, there was no testing of that verdict, it is presumed now that the jury found in Petrochoice's favor on all bases that it could. What that means when we look at this from kind of standard court perspective, because that's what this is, just to, you know, there was a lot of engineering talk and overpressurization and expert witnesses, but really this comes down to it's a regular old tort. Duty, breach, proximate cause, damages. The plaintiff has the burden of proof on each of those elements. They are instructed to each of those elements, and if they fail at any of those phases, the defendant wins. So much, in fact I would argue pretty much all of what plaintiff raises on appeal goes to starting with kind of proximate cause, which is why did the tank fail. It doesn't matter why it failed if Petrochoice exercised ordinary care when it filled the tank. What's the ordinary care that should have been at issue or maintenance that plaintiff should have performed on the tanks? Well, that doesn't go to the defendant's ordinary care, Your Honor. That goes to the potential cause of the, to the potential cause. So the signata. Signata testified that the tank ruptured in part because plaintiff failed to maintain the tanks. He offered testimony on a number of these days why the plaintiff was comparatively at fault, but none of that was objected to at the time. So that is completely forfeited. It was also, to the extent he wants to now talk about 213, you know, what Sullivan also talks about is that 213 is a shield, not a sword. So when you decide not to take the deposition of a witness that you know is going to testify at a trial, you do so at your own peril. But there was a five-page, single-space disclosure of Mr. Signata's opinions of the bases. Therefore, as Mr. Counsel noted, there was 800 pages of documents disclosed in support of that. The opinions talked about the failure to the clogged vent pipe. There was a number of photographs disclosed or many hundreds of photographs disclosed that were never an issue. But when it came down to it, when it came down to the point of the testimony about the failures, plaintiff didn't object. When there's no error preserved, there's nothing to consider on appeal. And we never get there anyhow because of the general verdict. That goes to the cause of the failure, which doesn't matter if Adrian Avila's actions in filling the tank were appropriate. If he exercised ordinary care in doing that or if the jury just didn't believe that the plaintiff didn't meet his burden on that. Counsel, I believe Mr. Ferris talked about 213 and the testimony relating to things that were beyond the defendant's control, i.e., the longevity, viability, difficulties, problems with the oil tanks. And would you argue that the references that he was originally arguing just today relative to 213 and the code or the lack thereof related not to your simple negligence but related to whether or not the plaintiff was greater than 50% contributory negligence? Well, so the plumbing code violations that were testified to really go to damages. That some of them go to the testimony with respect to the age of the tank is one thing, and that's just facts. It's literally stamped on the tank, so there's no question about that. There's also no question that there was a significant amount of rust at the rupture scene. That is not something that expert testimony is even required on. If you look at the Nguyen v. Lamb case out of the 1st District in 2017, that was a case where the trial court reversed a summary judgment on behalf of a homeowner. They had a, there was a catch basin in the backyard, and the cover was rusted and crude, and somebody fell through it. And the testimony in the trial court found that that needed to be the subject of expert opinion. On appeal, the appellate court said, well, no, it doesn't, and you don't need an expert to look at that and say, well, rust happens over a long period of time. They also had in that case, similar to this case, testimony by the homeowner that nobody had inspected or done anything with it in, like, 22 years. In that case, I think this was more closer to 15 or 20 years. But specifically with respect to the plumbing code violations in the 213, there was on direct examination, so what the 213 said was there was plumbing and building and plumbing code violations, I believe how it's stated in there, in a couple of places. There was also discussion in there about the gray water and the uncovered sump and the hooking the sewer into it, and that's why it. Would the oil have gotten to the first floor had the plumbing code been not violated? Well, that was Mr. Signata's opinion, and that was what he disclosed. The only thing that was literally not disclosed was the specific section in the Illinois, in the plumbing code. So that was not asked about on direct. And counsel's suggestion that that was simply like a rhetorical flourish on cross, I think, belies the fact that he asked about it for 12 pages. I counted when I was preparing for this. He started to ask about it. There was a little sidebar. The trial court made it entirely clear about what was going to happen if he continued to ask questions about it. The trial court also said, by the way, that if he could not point to a specific code section, that all that testimony would be stricken. So when it came time for redirect, trial counsel got up and said, is it this? Yes, it's this. And then they moved on. I would also note that there was no prejudice to plaintiff with respect to the identification of that code section because it wasn't in the jury instruction. We asked for a 6-0-1 instruction on it. The judge declined to give it. And then the concerns about the plumbing and the building code issues existed in this case from day one. It's in our affirmative defenses. It was in the affirmative defenses that we pled. It was in the jury instruction that the plaintiff proffered to the court as part of the comparative fault. So I think that can go to both cause and the actual damages portion of it, you know, what actually, like, and we never get to damages because 36-0-1 says you have no cause to consider damages if there's no liability. So almost everything the counsel raised in their brief goes to damages, which the jury never considered, beyond the fact that the error was not preserved really in any of those issues. Specifically, he talked about the jury instruction. And so, like, if you go through the laundry list of, you know, why something would not, well, first of all, damages issues alone are not the basis for reversible error. If he's not entitled to a new trial on the negligence portion of it, the damages don't matter because they're never reached. But with respect to the jury instruction, he didn't object at the time. His concern was not depreciation or whatever. His concern was, I just, he literally said this on the record. I just want to be able to ask for a number that equals $910,000. I want to be able to ask for this. I want to be able to ask for that. And I don't care, you know, how the court says it. So let me ask another question. I mean, I think it's Mr. Avila that, or was that his last name? Avila, I believe, was the delivery truck driver. He was familiar with his house. He had been there maybe, well, he had been there in November, plus he had serviced it several other times. These are technically above ground facilities because the tanks are not buried. However, they're in the house. And on this particular day, there's nobody there to let him in. Everything is happening from the outside. So how, I mean, how do we escape or how do we look around the fact that if all of these problems were so obvious, the rust, the age of the tanks, the uncovered area, how do, they never did check any, the defendant never did check any of those issues before it put oil in that external vent or what, I don't think they call that a vent, but external pipe. Yeah, it's called a blind fill, Your Honor. And that is entirely appropriate. It's how this tank had always been filled. There's no requirement that you go into the house and watch it. The safety mechanism is the vent whistle, which he could hear and he heard the entire time. I mean, but your affirmative defense was they should have known by the age, by the sight of these things, by the fact that that's not what happens in today's buildings. These are like 55 years old, I think. These tanks or something, I know they were very old. If it's his, if it's the plaintiff's responsibility to know about these things, why is your client using that fill and not knowing that it's going into appropriate receptacles? I don't believe there's any requirement, and I don't think the plaintiff offered any evidence that the blind fill in and of itself was not appropriate. I think it happens all the time. I mean, you're saying it would, obviously this whistle is important, but what if the blind fill is not attached to anything and you're just putting 350 gallons of oil on the floor? I mean, is there some obligation of your client to know that where that's going is adequate? I'm not aware of any. Is there any expert testimony relative to what Justice Hutchinson was inferring? I can't speak to the plaintiff, but certainly John Signata testified, and it's in his disclosure that the blind fill was appropriate. Maybe I should shorten it and say, was there any testimony indicating there was a duty for the, I think it's Mr. Vila, to pre-inspect the basement before he poured or pumped the oil into the tanks? And if he had maybe pumped a second or two of oil and then gone down into the basement to see if there was any leakage, and if there wasn't, then it was appropriate to go back and continue pumping. Or was he supposed to do it on five or ten minute intervals to determine whether or not there was any leakage? Is there any indication either in the standard operating procedures of blind fills or the industry that would suggest that what Justice Hutchinson was suggesting about inspecting the basement viable? Not that I'm aware of. And given that what happened in this situation was not a rapid over-pressurization but a gradual one, I don't, I mean, there wasn't, I'm not aware that there was a leak. There was literally the seam burst. So I'm not aware that there was any expert testimony or that there was any. Signata testified that the tank ruptured in part because plaintiff failed to maintain it, right? Failed to maintain the entire system. Well, specifically with respect to the rupture of the tank, he testified that it occurred in part because the plaintiff failed to maintain it. But he didn't offer any specifics as to what plaintiff failed to do to maintain it, right? I don't have that testimony right in front of me. I mean, I know that it was not objected to at trial. Well, it wasn't objected to, but there was no testimony as to what he could have done or should have done. I mean, the whole system was a problem, specifically the sump pump. But with regard to the tank itself, he didn't offer any specifics about what a layperson is supposed to do. I don't think that, I mean, what he said is they get old and they wear out. I'm old and wearing out. But you can't tell where the ruptures are. I have a pretty good guess. Your rust is very well covered, Your Honor. Are there any other questions? Just one. What about the argument about the closing argument, the only closing argument that the IEPA closed the file without ordering any remediation appropriate? But there was no file ever presented. It was hearsay, right? I mean, was it hearsay conversation? Yeah, it wasn't objected to. It went into evidence without objection, and once it's in evidence, counsel has a right to argue about it at closing arguments. And that wasn't the – well, there was a number of references to the – there were, I think, three. And I have them in front of me, and now they're buried in my pile. But also, it's true. So what's the prejudice to the plaintiff? The issue isn't what is prejudicial so much as it is what does the opening and closing of a file lead a reasonable person to conclude, and that is highly speculative. What Signata's testimony was on this particular issue that came in without any objection was that he spoke to the EPA, they closed their file, they didn't order any remediation. Which would relate to something other than liability. Absolutely. Any other questions? Thank you. Thank you, Your Honors. And please ask a – I have one question. Sure. Would it have made any difference at all if this was a pressurized thing? That is beyond my ken, Your Honor. I understand. Thank you. Mr. Ferris, you may proceed. Thank you, Your Honor.  Going back to Justice Hutchinson's point about Signata's testimony, so what he was asked about the EPA was, you had a conversation with someone from the EPA, and you said, yes, they opened the file and they closed the file. So analyzing this, what Mr. Signata did was he gave the basis for a 213 opinion, which was not disclosed. What counsel then did in closing was he actually gave those opinions to the jury undisclosed. Under the guise of reasonable inference from the evidence during closing arguments, it's permissible to draw reasonable inferences. But it's not permissible to publish opinions, expert opinions, to a jury during closing, which were never disclosed under Rule 213 and its stringent disclosure requirements. So that's actually what happened. Almost every case that you'll read on 213 involves an expert witness talking about opinions that were not contained in their report or deposition testimony or interrogatory answers. That's not what happened here. What do you think are the reasonable inferences that you would list based upon the limited testimony relating to the file being opened and the file being closed? I don't think that there's any reasonable inferences, and that's the basis of my objection. I don't have the opportunity to depose any EPA agent to say, what is the nature of your investigation? What was your investigation? What were your findings? What is your authority over this property? What can you order? Is it within your purview to order remediation? What is your authority under the statute? All of these questions, Your Honor, was something that should have been a subject of discovery that I was deprived of. If I can hit on, to not leave you all in suspense, with respect to the mechanics of the tank, because I learned way too much about above-ground storage tanks. There's air in the tank and there's oil. When the oil goes into the tank, the air that's in the tank is displaced. There's a vent whistle to which the delivery driver is listening to make sure it's whistling, which is the displacement of the air through the vent pipe. Oil goes in the fill pipe, the air goes out the vent pipe. Now, there's an old sign that I found on eBay that says, no whistle. So would it be reasonable to suggest that if the air that is being pushed out of the tank is not exiting the tank sufficiently fast, that there will be a pressure buildup and it will cause a breach in the tank? As long as the delivery person hears the whistle, then they can keep filling. There's an old sign, no whistle, no fill. So the tank is doing its job. If you hear the pressure being relieved through the relief... Do you understand the principle behind the bag? Sure, yes. The reason why you have to squeeze the bag is to keep the pressure high enough to cause the reeds to vibrate. So what is happening is what you just said doesn't necessarily follow, because the air could be going through the whistle, but there could be a backup or a buildup caused by the elbow squeezing the bag, or that there was some organic matter in the pipe that restricted the flow of gases outward. Because I'm sure that the design of the exhaust pipe was supposed to be a certain size diameter in order to allow the displacement based upon a rate per minute gallon load. And so the fact that the whistle is blowing doesn't necessarily mean that there isn't a buildup of pressure, especially if there's a constriction in the whistle pipe or the displacement pipe. So I just want to... Completely agree. You recited, you know your engineering, Your Honor. You're absolutely correct. And that is what happened. There was a buildup and the tank burst. Just one thing on liability. Mr. Avila was on the phone in violation of Petrochoice's company policy for two hours that morning. He was on the phone in particular at the time of the delivery. There's a delivery ticket which is time stamped. So the jury heard this evidence. And I speak of this because some of the case law talks about close cases where the evidence is close and the jury could have ruled either way. There was plenty of evidence of negligence. And as counsel correctly pointed out, liability relates to duty brief proximate cause. When counsel argued that 100% of this was caused by a plumbing code violation which was not disclosed, which plaintiff had no opportunity to investigate and refute.  There was reference to plumbing code violations in the materials received from Signata. Generically, Your Honor. Right. But not the specific code. And that's not a logical corollary which, as you know, is another. Well, you attributed it to the way the sump pump was hooked up. So the tank burst and the well migrated to a separate sump pump. It ran across the basement floor to a sump pump well, went in the well, and then was pumped up to the first floor. So it's not like the heating oil system was connected to the sump pump? I thought it went to the septic field and then backed up from the septic field. Once that was filled, then it went up to the first floor. You're correct, Your Honor. I skipped that step. I heard the buzzer. I'm trying to move along. You didn't want to put your mind into a septic field. No. I believe that there was testimony by Mr. Villa that said that it took him 20-some minutes to fill the tank. And if you divide 350 by 22, that comes out to about 22 gallons per minute if it's a constant fill. And I believe the testimony was it had to be at least 50 pounds of pressure, back pressure, to cause the tank to burst. You're correct. So I did that extrapolation based on gallons per minute and the amount of time. I did that. That was part of my cross-examination. And my expert said that you can only safely fill at so many psi. And based on that extrapolation of the 350 gallons, I argued that he exceeded the recommended psi. He was pumping too fast. And that was one of the allegations in the complaint, that he pumped too fast. Especially in light of a specific delivery instruction to pump slowly, the tank splashed back on the previous delivery. So he was under a specific delivery instruction to pump slowly. I presented evidence that based on what your Honor's calculation, that you just recited, that he was 50 gallons per minute and he should have been at 20. I don't remember the exact numbers, but you're right on point, Judge. Okay. Your time is up. Are there any other questions? I have none. Thank you, Your Honor. Thank you. We'll take the case under advisement. Court is adjourned.